**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | |
|---|---|
| **RAY GOORAH,**<br><br>*Plaintiff,*<br><br>**v.**<br><br>**TROY MEINK, SECRETARY, DEPARTMENT OF THE AIR FORCE,**<br><br>*Defendant.* | **CIVIL ACTION NO. 5:24-cv-00322-TES** |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

In his Motion for Summary Judgment [Doc. 25], Defendant Troy Meink, Secretary, Department of the Air Force ("Defendant" or "the Government") contends that Plaintiff Ray Goorah is unable to create a "genuine dispute of material fact as to whether he was the subject of discrimination" in his employment discrimination action for failure to promote under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* [Doc. 25-1 at p. 1]. As discussed in more detail below, the Court agrees and **GRANTS** Defendant's Motion for Summary Judgment.

## FACTUAL BACKGROUND

Plaintiff began his Air Force civilian employee career in approximately 2002. [Doc. 34-1, ¶ 1]. For the next two decades, he worked as an aerospace engineer in the Special Operations Forces Personnel Recovery & Rotary Division, alternating between

work on helicopters and fixed-wing aircraft. [*Id.* at ¶ 2–6]. During the time period relevant to this lawsuit, Plaintiff's chain of command fell under the umbrella of Rotary Wing Engineering. [*Id.* at ¶ 8]. At the time, Plaintiff's first-level supervisor was Steven Lamb. [*Id.* at ¶ 9]. Plaintiff's second-level supervisor was Byron Givens. [*Id.* at ¶ 10].

On August 26, 2021, John Soltis, a Rotary Wing Technical Advisor, emailed a listserv, including an Air Force engineering group, and notified them that there was a Jobs Board posting for an open position as Rotary Wing Systems & Integrity Branch Chief (NH-0801-04). [*Id.* at ¶ 12]; [Doc. 25-1, p. 3]. Plaintiff first learned of the job posting through this email. [Doc. 34-1, ¶ 13]. Plaintiff applied for the position by submitting a written application. [*Id.* at ¶ 14]. He was one of 17 applicants who provided a resume for review. [*Id.* at ¶ 15]. Two separate officials scored each resume according to certain evaluation criteria. [*Id.* at ¶ 16]. Plaintiff received the highest score by the two selecting officials on the resume review. [*Id.* at ¶ 17]. On one scoring matrix, Plaintiff scored 95. [*Id.* at ¶ 18]. The next highest scores belonged to Jonathan Belknap and Steve Oliver, both of whom scored 90. [*Id.*]; [Doc. 27, p. 43]. On the other scoring matrix, Plaintiff scored another 95. [Doc. 34-1, ¶ 19]. The next highest scores belonged to Ricky Solomon, who scored 91, and Mr. Oliver, who scored 90. [*Id.* at ¶ 19]; [Doc. 27, p. 44].

According to Air Force Manual 36-203, which addresses staffing civilian positions, conducting interviews is discretionary and is not required in every selection

2

process. [Doc. 34-1, ¶ 20]. In fact, candidates do not have to be interviewed, but for those who are, the same interview questions must be used for each candidate. [*Id.* at ¶ 21]. When interviews are conducted, the Air Force Manual recommends that three to five questions be developed to use in the interview process. [*Id.* at ¶ 22]. The Air Force Manual also requires that the questions used in the interview process be job-related and tied to the knowledge, skills, and abilities for the position. [*Id.* at ¶ 23].

On September 24, 2021, Mr. Soltis notified Plaintiff that he was selected to interview for the open position. [*Id.* at ¶ 24]. Plaintiff accepted the opportunity to interview and informed Mr. Soltis that he was available to interview on October 1, 2021. [*Id.* at ¶ 25]. Mr. Soltis scheduled his interview for that very day. [*Id.*]. On September 29, 2021, Mr. Soltis sent a confirmation email to Plaintiff. [*Id.* at ¶ 26]. In that email, Mr. Soltis informed Plaintiff that he would be given 15 minutes to review the interview questions and make notes, that the 30-minute interview would follow, and that Plaintiff would be permitted to bring one page of notes with him to use during the question review period. [*Id.*].

A panel including Byron Givens, John Soltis, and Jill Burgess interviewed Plaintiff. [*Id.* at ¶ 27]. The official Air Force job announcement indicates that Mr. Soltis acted as the selecting official for this job posting. [Doc. 25-3, p. 2]. Both Mr. Soltis and Ms. Burgess have indicated that no one directed or persuaded them in their hiring recommendation. [Doc. 25-4, p. 5]; [Doc. 25-6, p. 4].

According to Mr. Givens, the panel members received the following verbal instructions prior to the interviews: "Panel members were provided copies of the questions with the max points allowed. The general format of the interview was discussed (30 minutes total time with 5 questions and 1 observation.)" [Doc. 34-1, ¶ 31]. The interview panel posed the exact same questions to each interviewee. [*Id.* at ¶ 32]. The questions sought information about prior experience and accomplishments, defining differences between rotary wing and fixed wing aircrafts, and testing each applicant's technical understanding and capabilities. [*Id.* at ¶ 34]. Interview panelists were not allowed to ask any questions outside of those standardized questions that were agreed to in advance. [*Id.* at ¶ 35]. Each question had an "anchor," which was a key part of the answer that the interview panel was listening for in response to the question. [*Id.* at ¶ 36]. Each interviewee was allowed up to thirty minutes to answer the questions. [*Id.* at ¶ 37]. Each of the interview panelists took handwritten notes about the response provided by the interviewees. [*Id.* at ¶ 38]. Each interviewee was given a uniform amount of time to prepare and respond to the questions. [*Id.* at ¶ 53]. During the interviews, panelists were not given leeway to ask questions or provide feedback during the interview process. [*Id.* at ¶ 54].

Each of the three panelists gave Plaintiff similar scores. For example, Plaintiff received a lower score from all three interview panelists, with Mr. Soltis even noting that Plaintiff's interview answers were "lacking in depth and discussion of the subject."

[Doc. 25-4, p. 4]. Mr. Soltis also noted that while Plaintiff was given the full thirty minutes for his interview, he took less than half of the allotted time. [*Id.*]. Ms. Burgess indicated that Plaintiff "did not meet the anchors or all of the specific criteria or he did not provide enough information" in response to the panel's questions. [Doc. 25-6, p. 3]. For his part, Mr. Givens expressed that Plaintiff "tanked the interview" and that he "believed he didn't have to talk about information already in his resume." [Doc. 25-5, p. 4].

In contrast, Mr. Belknap earned the highest interview score. *See generally* [Doc. 25-8, pp. 1–18]. In his interview notes, Mr. Soltis remarked that Mr. Belknap "spoke for the whole time allotted, addressed the areas being graded in greater detail, and expressed a greater depth of knowledge of the questions being asked." [Doc. 25-4, p. 4]. Ms. Burgess echoed that sentiment, adding that Mr. Belknap "provided more information and gave multiple examples of everything" and that he "did a good job of providing clear and concise response and made good eye contact" when answering questions. [Doc. 25-6, pp. 3–4]. Mr. Givens agreed, noting that Mr. Belknap "answered all of the questions and did really well, which is documented in [the panelists'] notes." [Doc. 25-5, p. 4].

By way of example, Mr. Soltis allotted 27 out of a possible 50 points to Plaintiff on the first interview question and Ms. Burgess assigned Plaintiff 25 points for his answer to the same question. [Doc. 25-9, p. 1, 13 respectively]. In comparison, Ms.

Burgess awarded Mr. Belknap 42 points for his response to the first question while Mr. Soltis awarded him 43 points for the same question. [Doc. 25-8, p. 1, 13 respectively]. When asked about Plaintiff's qualifications as compared to Mr. Belknap, Ms. Burgess explained that "[t]he number of years of experience doesn't mean he has the right kind of experience. Longevity doesn't get a person the job. They must meet the qualifications and have the right experience for the position. Most importantly, they have to explain that in the interview." [Doc. 25-6, p. 4]. Mr. Soltis shared this view and added that experience would be reflected as part of the resume review, but that "just because someone has been doing the job longer, doesn't mean they are the best qualified." [Doc. 25-4, p. 4].

On October 26, 2021, Mr. Soltis sent an email to the same engineering email listserv that he used in August 2021, congratulating Mr. Belknap for being selected for the Rotary Wing Systems & Integrity Engineering Branch Chief position. [Doc. 25-10]. In his email, Mr. Soltis noted that Mr. Belknap "brought over twelve years of Rotary Wing Structural, Systems, and Integrity Programs engineering experience" and that his "previous helicopter experience and proven performance made him the perfect candidate." [*Id.*]. Plaintiff was not aware that Mr. Belknap had been selected until he received that email. [Doc. 34-1 at ¶ 42].

On November 4, 2021, Plaintiff contacted the Equal Opportunity Office ("EEO") at Robins Air Force Base to file an informal complaint of discrimination based on race,

color, and national origin. [*Id.* at ¶ 47]. The EEO complaint was not resolved, and

Plaintiff filed a formal complaint of discrimination on April 6, 2022. [*Id.* at ¶ 48]. "On

March 7, 202[3], Administrative Judge Shayla N.M. Sipp entered a notice of proposed

summary judgment in the administrative proceeding." [*Id.* at ¶ 50]; *see also* [Doc. 1-3, p.

1 (noting concern with incorrect dates on documents)]. "Then, on March 23, 202[3], after

reviewing submissions by both Plaintiff and the Agency, Judge Sipp determined

summary judgment was appropriate in favor of the Agency because Plaintiff was

unable to point to evidence of discrimination as to the Agency's decisions for selecting

Mr. Belknap for the promotion." [Doc. 25-12]; *see also* [Doc. 1-3, p. 1 (noting concern

with incorrect dates on documents)].[1]

On September 18, 2024, Plaintiff filed his Complaint alleging employment

discrimination action for failure to promote under Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000e, *et seq. See* [Doc. 1]. On September 26, 2025, the Government filed

its Motion for Summary Judgment.

---

[1] Both the Government's Memorandum in Support of Defendant's Motion for Summary Judgment and Statement of Undisputed Material Facts reflect that Judge Sipp entered a notice of proposed summary judgment in the administrative proceeding on March 7, 2022, and that Judge Sipp determined summary judgment to be appropriate on March 23, 2022. *See* [Doc. 25-1, p. 7]; [Doc. 25-16, ¶¶ 50, 51]. Plaintiff does not object to these assertions in his Response to the Government's Statement of Undisputed Facts. *See* [Doc. 34-1 at ¶¶ 50, 51]. However, in Plaintiff's Brief in Support of his Appeal of Judge Sipp's Order, Plaintiff notes that he believes the year listed on the Notice of Proposed Summary Judgment (dated March 7, 2022) and the Decision and Order Entering Judgment (dated March 23, 2022) are in error and should be 2023. As such, for clarity, the Court assumes that the documents should have been dated with the year 2023.

## **LEGAL STANDARD**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The moving party bears the initial responsibility of informing the court of the basis for its motion." *Four Parcels*, 941 F.2d at 1437. The movant may cite to particular parts of materials in the record, including, "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); Fed. R. Civ. P. 56(c)(1)(A).[2] "When the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 323). Rather, "the moving party simply may show—that is, point out to the district court—

---

[2] Courts may consider all materials in the record, not just those cited by the parties. Fed. R. Civ. P. 56(c)(3).

that there is an absence of evidence to support the nonmoving party's case." *Id.*

(quoting *Celotex*, 477 U.S. at 324) (cleaned up). Alternatively, the movant may provide

"affirmative evidence demonstrating that the nonmoving party will be unable to prove

its case at trial." *Id.*

If this initial burden is satisfied, the burden then shifts to the nonmoving party,

who must rebut the movant's showing "by producing . . . relevant and admissible

evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d

1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324). The nonmoving party does

not satisfy its burden "if the rebuttal evidence 'is merely colorable or[] is not

significantly probative' of a disputed fact." *Id.* (quoting *Anderson*, 477 U.S. at 249–50). "A

mere scintilla of evidence supporting the [nonmoving] party's position will not suffice."

*Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

Further, where a party fails to address another party's assertion of fact as

required by Federal Rule of Civil Procedure 56(c), the Court may consider the fact

undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2); *see also* n.2, *supra*.

However, "credibility determinations, the weighing of the evidence, and the drawing of

legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*,

477 U.S. at 255. Succinctly put,

> [s]ummary judgment is not a time for fact-finding; that task is reserved for
> trial. Rather, on summary judgment, the district court must accept as fact
> all allegations the [nonmoving] party makes, provided they are sufficiently
> supported by evidence of record. So[,] when competing narratives emerge

> on key events, courts are not at liberty to pick which side they think is more credible. Indeed, if "the only issue is one of credibility," the issue is factual, and a court cannot grant summary judgment.

*Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020) (internal citations omitted).

"[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. The nonmovant's evidence is to be believed, and "all justifiable inferences are to be drawn in his favor." *Id.* at 255. "[I]f a reasonable jury could make more than one inference from the facts, and one of those permissible inferences creates a genuine issue of material fact, a court cannot grant summary judgment." *Sconiers*, 946 F.3d at 1263.

## **DISCUSSION**

Plaintiff's primary argument is that the Government discriminated against him because of his race, color, and national origin when Defendant selected a white male for the Chief of Rotary Wing Systems and Integrity Engineering Branch over Plaintiff. [Doc. 1 at pp. 3–4]. Under the federal-sector provision of Title VII, "personnel actions affecting employees or applicants for employment . . . in executive agencies . . . shall be free from any discrimination based on race . . . or national origin."[3] 42. U.S.C. § 2000e-16(a). This

---

[3] "[T]he *McDonnell-Douglas* framework and the 'convincing mosaic' test . . . 'no longer apply' to cases brought under the federal-sector provision of Title VII" because those "are methods used to show that a protected characteristic was the but-for cause of the ultimate decision." *Durr v. Sec'y of Dept. of Veterans Affs.*, No. 21-12867, 2022 WL 2315086 (11th Cir. June 28, 2022) (citing *Durr v. Sec'y of Dept. of Veterans Affs.*, 843 F. App'x 246, 247 (11th Cir. 2021)). Plaintiff must only "show that discrimination played any part in

means that "personnel actions must be made in 'a way that is not tainted by differential treatment based on' a protected characteristic." *Terrell v. Sec'y, Dept. of Veterans Affs.*, 98 F.4th 1343, 1352 (quoting *Babb v. Sec'y, Dep't of Veterans Affs.*, 992 F.3d 1193, 1199 (11th Cir. 2021)).

Thus, to survive summary judgment, Plaintiff must make a sufficient factual showing to permit a reasonable jury to find that his race, color or national origin "play[ed] any role" in, or "tainted," the hiring process. *Id.*; *see Lewis v. City of Union City*, 918 F.3d 1213, 1217 (11th Cir. 2017) ("Faced with a defendant's motion for summary judgment, a plaintiff asserting an intentional-discrimination claim under Title VII . . . must make a sufficient factual showing to permit a reasonable jury to rule in [his] favor."). However, "even if [Plaintiff] proves that [unlawful] discrimination tainted the decision-making process, he is not necessarily entitled to all remedies." *Terrell*, 98 F.4th at 1352 (quoting *Buckley v. Sec'y of Army*, 97 F.4th 784, 793 (11th Cir. 2014)). A showing that discriminatory animus merely tainted the hiring process only entitles a plaintiff to "injunctive or other forward-looking relief." *Id*. To obtain retrospective relief, such as compensatory damages and backpay, a federal employee must still prove that discrimination was the "but-for cause of [his] non-selection." *Id.*

---

the way the decision was made." *Terrell*, 98 F.4th 1343, 1352 (quoting *Babb*, 992 F.3d at 1199). *See also Buckley v. Sec'y of Army*, 97 F.4th 784, 794-95 ("So using the *McDonnell Douglas* framework for § 2000e-16(a) claims is like requiring the plaintiff to move a boulder when she need only push a pebble—in other words, the burden under *McDonnell Douglas* is heavier than Title VII imposes on a plaintiff in a federal-sector case.").

First, the Court considers whether Plaintiff can demonstrate that unlawful discrimination tainted the hiring process, which would entitle him to prospective relief. *Terrell*, 98 F.4th at 1352. Because Plaintiff doesn't satisfy this lower burden, the Court need not consider whether he could clear the higher bar required for retrospective relief by showing discrimination was the "but-for cause of [his] non-selection." *Id.*

Plaintiff points to the interview process as being problematic in his case. As an initial note, the decision to conduct an interview as part of a hiring process does not mean that discrimination is ultimately at play. The Eleventh Circuit has recognized that an interview is a valuable hiring tool, even when subjective analysis is used during that process. *See Chapman v. AI Transp.*, 229 F.3d 1012, 1033 (11th Cir. 2000). Furthermore, "[a] subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which it based its subjective opinion." *Id.* at 1034.

In this case, the record indisputably indicates that the panel conducted the interviews in a highly structured manner that was not purely subjective. The panelists asked each interviewee the same five standardized questions, and each interviewee received the same amount of time to prepare for the interview. [Doc. 34-1, ¶¶ 52, 53]. Interview panelists were not permitted to deviate from the five standardized questions, nor were they permitted to give any feedback at the time of the interviews. [*Id.* at ¶ 54]. Further, Plaintiff complains that the five standardized questions did not comply with

Air Force Manual § 3.16.2.1, which requires that "[e]ach question should be structured with three to four descriptive anchors with points allocated to each anchor." [Doc. 34, p. 7]. However, the panel identified clear anchors for each question asked of the interviewees as demonstrated by the note sheets used by each interview panelist. *See* [Doc. 25-8, pp. 1–18]; [Doc. 25-9, pp. 1–18]. The panelists allocated point values to each question. [*Id.*]. Although each anchor did not have an assigned point value, that certainly does not evidence any race, color or national origin discrimination tainted the hiring process, and Plaintiff hasn't pointed to any evidence to the contrary.

Further, interview panelists gave Plaintiff fairly uniform scores much lower than Mr. Belknap and provided ample reasoning for doing so. *See* [*Id.*]. Plaintiff's argument that this result was rooted in discrimination is not supported by any evidence in the record. On the contrary, each panelist gave a reasonable nondiscriminatory justification for their scoring analysis. Mr. Soltis remarked that Plaintiff's answers were "lacking in depth and discussion of the subject." [Doc. 25-4, p. 4]. Mr. Soltis also noted that Plaintiff was given a full thirty minutes for his interview but only used about half the time. [*Id.*]. Similarly, Ms. Burgess stated that Plaintiff "did not meet the anchors on all of the specific criteria or he did not provide enough information." [Doc. 25-6, p. 3]. Mr. Givens added that Plaintiff did not think he had to answer questions because the information was already on his resume. [Doc. 25-5, p. 4].

In contrast, Mr. Belknap scored the highest on his interview. *See generally* [Doc. 25-8, pp. 1–18]. Mr. Soltis stated that Mr. Belknap "spoke for the whole time allotted, addressed the areas being graded in greater detail, and expressed a greater depth of knowledge of the questions being asked." [Doc. 25-4, p. 4]. Ms. Burgess also noted that Mr. Belknap "provided more information and gave multiple examples of everything" and he did a "good job of providing clear and concise response and made good eye contract" when answering questions. [Doc. 25-6, pp. 3–4]. Mr. Givens noted that Mr. Belknap "answered all of the questions and did really well, which is documented in [their] notes." [Doc. 25-5, p. 4].

Plaintiff also argues the interview panelists underscored his interview, pointing to an example where Mr. Soltis gave Mr. Belknap a higher score on a question while recording fewer notes about his response. In another example, Plaintiff argues that Mr. Belknap did not hit any of the anchors per the interview notes, but still got a perfect score from all interview panel members. [Doc. 34, pp. 7–8]. Plaintiff characterizes these perceived inconsistencies as a "sham or pretext to try and mask discrimination . . ." [*Id.* at p. 8].

However, the record clearly belies this contention. No reasonable person should expect any panelist would take notes on every single answer or record every internal thought they had in relation to every question asked. The record completely lacks any evidence of discriminatory intent that Plaintiff has identified in the notes that were

14

taken or in the assessments given by the panelists. The panelists followed a uniform process for each candidate with each candidate given an equal opportunity to succeed. Plaintiff has offered no clear evidence of discrimination in the process. His claims cannot be supported by mere conjecture or discontent with the process. Nor does he offer any evidence that the panelists' comments were pretext designed to cover up discrimination. Without more, the Court can't conclude that the interview panelists engaged in unlawful discrimination.

Plaintiff's second major complaint stems from his perception and contention that he is more qualified for the position than Mr. Belknap and thus should have been awarded the position. Plaintiff believes he "had the most experience, most education, most training, most skill sets" and that any reasonable person would believe that he should have been selected for the position. [Doc. 27, p. 71]. When comparing the two resumes and interview performances of Mr. Belknap and Plaintiff, it cannot be said, however, that no reasonable person would select Mr. Belknap for the position over Plaintiff.

Plaintiff shows that he has twenty years of experience with the government and has earned outstanding performance ratings for the last three of those years. [Doc. 34, p. 2]. In comparison, Plaintiff points to the fact that Mr. Belknap was hired on June 8, 2020, and was still technically within a two-year probationary period. [*Id.* at pp. 10–11]. Plaintiff also argues that his resume was unanimously scored higher than Mr. Belknap's

and that in the past, the candidate with the highest resume score got the job without an interview. [*Id.* at p. 11]. Plaintiff, however, ignores Mr. Belknap's "over twelve years of Rotary Wing Structural, Systems, and Integrity Programs engineering experience." [Doc. 25-10, p. 1]. But nothing in our law mandates that the longest-serving employee receive the next promotion. Employers, including the federal government, retain the flexibility to hire the best person for the job without federal courts sitting as super-personnel departments. *Lewis v. Fouts Bros., Inc.*, No. 5:24-CV-00407-TES, 2026 WL 228021 (M.D. Ga. Jan. 28, 2026) (citing *Akridge v. Alfa Ins. Co.*, 93 F.4th 1181, 1195 (11th Cir. 2024)).

In terms of supervisory experience, Plaintiff himself points to the fact that Mr. Belknap had been serving in the selected role as interim supervisor. *See* [Doc. 34, p. 8]; [*Id.* at p. 17]; [Doc. 34-3, p. 2]. Additionally, per the Air Force Manual, interviews were discretionary. [Doc. 34-1, ¶ 20]. There is nothing discriminatory about requiring an interview for all candidates, a scenario clearly allowed by the applicable Air Force regulations. Just because earlier selections excluded an interview does not indicate that this panel included an interview portion to carry out some discriminatory purpose aimed at Plaintiff. Selection officers may require an interview when they feel it is needed—hence the word *discretionary*.

When specifically asked about Plaintiff's qualifications as compared to Mr. Belknap, Ms. Burgess explained that "[t]he number of years of experience doesn't mean

he has the right kind of experience. Longevity doesn't get a person the job. They must meet the qualifications and have the right experience for the position. Most importantly, they have to explain that in the interview." [Doc. 25-6, p. 4]. Mr. Soltis added that while experience would be reflected as part of a resume review, "just because someone has been doing the job longer, doesn't mean they are the best qualified" person for the job. [Doc. 25-4, p. 4]. Mr. Givens admits that he did not initially approach Plaintiff for the role because "he can be confrontational, which is not a good character trait to have as a supervisor." [Doc. 25-5, p. 5]. Nonetheless, Mr. Givens still expected Plaintiff to be selected for the position, and "if he had done better in the interview, he would have been selected." [*Id.*]. To the extent that Plaintiff accuses Mr. Givens specifically of harboring racial animus against him, this is easily contradicted by the record, which shows that Mr. Givens told Plaintiff that "[he is] a great engineer [ ] and [Mr. Givens was] glad to have [Plaintiff] on [his] team. In terms of this position [Plaintiff's] interview is what held [him] back . . ." [Doc. 27-9, p. 1]. Mr. Givens then offered to sit down with Plaintiff and give him feedback on that process and areas of improvement. [*Id.*] Beyond Plaintiff's pure speculation, nothing indicates that Mr. Givens had any racial animus toward Plaintiff whatsoever.

At the end of the day, Plaintiff just doesn't have any evidence of discriminatory animus that would lead a reasonable person to believe that he was denied the job based on his race, color, or national origin. Plaintiff fervently believes he is the most qualified

17

person for the job. But, the fact remains that, based primarily on Plaintiff's subpar interview performance, the three panelists did not agree. And, unfortunately for Plaintiff, his "personal belief that he was more qualified is not sufficient to demonstrate discriminatory intent." *Rowell v. BellSouth Corp.*, 433 F.3d 794, 799 (11th Cir. 2005) (citing *Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1253–54 (11th Cir. 2000)).

The record remains crystal clear that although Plaintiff may have had the best resume, all three panelists found his interview performance to be well below the other candidates. Plaintiff's interview — not his race, color or national origin — cost him the job. The Court easily agrees. Bottom line, Plaintiff simply failed to offer any evidence that his race, color or national origin tainted the hiring process. And, without such evidence, Plaintiff cannot prevail.

<u>CONCLUSION</u>

Accordingly, the Court **GRANTS** Defendant's Motion for Summary Judgment [Doc. 25]. The Court **DIRECTS** the Clerk of Court to **ENTER** Judgment in favor of Defendant and **CLOSE** this case.

**SO ORDERED**, this 4th day of March, 2026.

S/ *Tilman E. Self, III*  
**TILMAN E. SELF, III**  
**UNITED STATES DISTRICT JUDGE**